as hot flashes and vaginal atrophy. Wyeth, however, has long touted additional benefits for Premarin, and its subsequently marketed hormone therapy drugs, Prempro, Premphase and medroxyprogesterone acetate.

211. In the 1960's, Wyeth's Premarin promotional materials utilized articles and books written by Dr. Robert Wilson, a Brooklyn, New York, gynecologist, who recommended uses of Premarin far beyond those approved by the FDA. In a 1962 article, which appeared in the *Journal of the American Medical Association* (*JAMA*), Dr. Wilson claimed taking estrogen during menopause *reduced* breast and genital cancers. In his 1966 bestselling book entitled *Feminine Forever*-- which Wyeth's sales forces distributed to physicians throughout the country-- Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent . . . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair . . . Estrogen makes women adaptable, even-tempered, and generally easy to live with." In the book, Dr. Wilson again asserted that estrogen prevented cancers.

212. Following Dr. Wilson's publications, sales of Premarin quadrupled. Wyeth poured thousands of dollars into Dr. Wilson's research. By the mid-70s, more than 30 million prescriptions for Premarin were being written every year, eventually making it the fifth most frequently prescribed drug in the United States.

213. Physicians were instructed in advertisements to prescribe Premarin to achieve "tranquilizing" effects for their female patients-- as if that effect was a laudable goal: "Almost any tranquilizer might calm her down . . . but at her age, estrogen may be what she really needs."

214. The promotional advertising downplayed the risks of hormone therapy and over promoted the benefits. A 1970's article in *Harper's Bazaar* claimed: "There doesn't seem to be a sexy thing estrogen can't and won't do to keep you flirtatiously feminine for the rest of your

days . . .a real package deal that spruces up your vagina . . . Prevalent medical opinion is that the safety and benefits of ERT have been convincingly demonstrated."

215.    But the "safety and benefits" of Premarin were cast in serious doubt following the 1976 publication in the New England Journal of Medicine of a study evidencing a causal relationship between estrogen and endometrial cancer.  Sales plummeted, and physicians stopped prescribing Premarin except to those women who had hysterectomies and thus were not at risk for endometrial cancer.

216.    A 1980 medical article suggested a solution.  Dr. Don Gambrell reported in the journal *Obstetrics and Gynecology* that adding progestin to estrogen led to a *decline* in endometrial cancer.  Wyeth thus produced and marketed progestin (i.e., synthetic progesterone or medroxyprogesterone acetate) as an adjunct to Premarin estrogen hormone therapy to protect against the risk of endometrial cancer.

217.    Wyeth does now and has manufactured, marketed, and distributed medroxyprogesterone acetate for use in combination with Premarin under trademarked brand names such as Provera and Cycrin and as generic equivalents.  And, Prempro and Premphase have the added synthetic progesterone.

218.    Additional claims were made in the 1980's when Wyeth promoted hormone therapy to help prevent bone loss, and when Wyeth claimed that hormone therapy drugs could prevent cardiovascular disease.  By claiming that hormone therapy drugs prevented osteoporosis and cardiovascular disease, Wyeth was able to promote Premarin as recommended treatment for all women, whether or not they were experiencing menopause.  As a result, between 1990 and 1995 Premarin became the most frequently dispensed prescription drug in the United States.

219.    Premarin's huge success was bolstered by claims that indefinite, long term use of

estrogen therapy was safe and efficacious.  In an early 1990's promotional videotape distributed directly to consumers entitled "What every woman should know about estrogen," Wyeth represented to women that estrogen provided "long term health protection" and should be continued indefinitely, even after short-term menopausal symptoms, such as hot flashes, had subsided.  When a purported consumer inquired how long Premarin should be taken, Wyeth's doctor-spokesperson responded "anywhere from five to ten years in order to get protection from long term problems."  And, with regard to breast cancer risks, Wyeth represented to women that the benefits of taking estrogen "far outweigh[ed]" the risks for women unless they faced a particularly high risk of breast cancer.

220.    Prior to 1995, Wyeth began to develop a combination therapy pill that would combine Premarin with progestin.  This product development was necessary since Wyeth was faced with the threat of a shrinking market for Premarin at the end of its patent protection in 1995.

221.    In 1995 Wyeth introduced Prempro and Premphase, "combination" hormone therapies that contained estrogen and medroxyprogesterone acetate (synthetic progestin).

222.    Physicians and females were led by Wyeth to believe the promotional claims it made regarding Premarin.  When Prempro and Premphase were introduced to the market by Wyeth, physicians and women were led to believe that the same claims existed for these hormone therapies as Wyeth had claimed about Premarin.

223.    Wyeth over-promoted Prempro and Premphase just as it did Premarin.  For example, Wyeth distributed a brochure that asked women to "Take a few minutes to think about the rest of your life," and then listed medical conditions to "think about," which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease, and colon cancer.

224.    In a magazine advertisement featuring model Lauren Hutton, Wyeth made a rash of similar claims, suggesting that its hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss.  In the March 19, 2000, edition of *Parade Magazine,* Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit, and she answered: "[M]y number one secret is estrogen.  It's good for your moods; it's good for your skin.  If I had to choose between all my creams and makeup for feeling and looking good, I'd take the estrogen.

225.    Wyeth's DTC (i.e., "direct-to-consumer" or "DTC" marketing) efforts have included overt advertising pieces, such as print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which hormone therapy drugs are favorably positioned in entertainment vehicles or favorably described in the popular press by hired spokespersons.

226.    Wyeth has vigorously promoted hormone therapy to physicians, as well as to consumers directly.  In 1999, Wyeth spent $34.7 million on DTC advertising for Prempro.  In 2000, Wyeth spent $37.4 million on Prempro DTC advertising.  The thrust of Wyeth's marketing efforts has been to create a lifelong consumer demand for hormone therapy, and a belief by physicians that the prescription is beneficial to menopausal and post-menopausal patients.

**B.      The WHI and NCI Studies**

227.    Wyeth's promotion of hormone therapy for long-term use proved false and misleading when studies released in July 2002 showed that such use substantially increases the risk of *causing* disease.

228.    Two large cohort studies concluded that the risks of hormone therapy outweighed the

benefits for most women: The WHI study, reported at Roussow JE, et al., *Risks and Benefits of Estrogen Plus Progestin in Healthy Post-menopausal Women.* (JAMA. 2002 Jul 17; 288:321-33.); and, the NCI study, reported at Lacey JV Jr., et al., *Menopausal hormone replacement therapy and risk of ovarian cancer.* (JAMA. 2002 Jul 17; 288(3):334-41.)

229.    The Women's Health Initiative (WHI) is a group focused on defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in post-menopausal women. Between 1993 and 1998, the WHI enrolled 161,809 post-menopausal women in the age range of 50 to 79 years into a set of clinical trials and an observational study at 40 clinical centers in the United States. Included within the clinical trials was a study by the National Heart, Lung, and Blood Institute (NHLBI) of the National Institutes of Health (NIH).

230.    Participants in the NHLBI component of WHI, like most women with a uterus who take hormone therapy, were given progestin in combination with estrogen (i.e., combination hormone therapy). The estrogen plus progestin trial of the WHI involved 16,608 women ages 50 to 79 years with an intact uterus. An important objective of the trial was to examine the effect of estrogen plus progestin on the prevention of heart disease and hip fractures, and any associated change in risk for breast and colon cancer. The study did not immediately address the short-term risks and benefits of hormones for the treatment of menopausal symptoms.

231.    Women enrolled in the estrogen plus progestin study were randomly assigned to a daily dose of estrogen plus progestin (0.625 mg of conjugated equine estrogens plus 2.5 mg of medroxyprogesterone acetate) or to a placebo. Those participants receiving the drug (not placebo) received Wyeth's drug Prempro. Participants were enrolled in the study between 1993 and 1998 at over 40 clinical sites across the country.

232.    In 2000 and again in 2001, WHI investigators complied with a recommendation from the study's Data and Safety Monitoring Board (DSMB) to inform participants of a small increase in heart attacks, strokes, and blood clots in women taking hormones.  The DSMB, an independent advisory committee charged with reviewing results and ensuring participant safety, found that the actual number of women having any one of these events was small and did not cross the statistical boundary established to ensure participant safety.  Therefore, the group recommended continuing the trial due to the still uncertain balance of risks and benefits.

233.    At the DSMB's meeting on May 31, 2002, the data review revealed for the first time that the number of cases of invasive breast cancer in the estrogen plus progestin group had crossed the boundary established as a signal of increased risk.  The DSMB's May 31, 2002, recommendation to stop the trial was based on the finding of increased breast cancer risk, supported by the evidence of overall health risks exceeding any benefits.  On July 8, 2002 participants started receiving letters informing them about the results and telling them that they should stop study medications.

234.    The WHI Study found that for the estrogen plus progestin group (i.e., those women who took Prempro) compared to placebo, overall there was a:

      i.    41 percent increase in strokes,

      ii.    29 percent increase in heart attacks,

      iii.    a doubling of rates of venous thromboembolism (blood clots),

      iv.    22 percent increase in total cardiovascular disease,

      v.    26 percent increase in breast cancer,

      vi.    a 37 percent reduction in cases of colorectal cancer, and

      vii.    a one-third reduction in hip fracture rates.

235.     The WHI Study concluded that the "Overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2-year follow-up among healthy post-menopausal US women." The Study also found that the combination hormone regimen should not be initiated or continued for primary prevention of coronary heart disease.

236.     Because of the importance of the report from the WHI investigators on the estrogen plus progestin study, the study was released early to the public on July 9, 2002, as an expedited article on the *JAMA* Web site. In commenting on the studies findings, NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

> The cardiovascular and cancer risks of estrogen plus progestin outweigh any benefits—and a 26 percent increase in breast cancer risk is too high a price to pay, even if there were a heart benefit. Similarly, the risks outweigh the benefits of fewer hip fractures.

237.     Dr. Jacques Roussow, acting director of the WHI and lead author of the JAMA article, summarized the risks of combination hormone therapy in a very straightforward manner as he explained the statistical significance of the study results:

> The WHI results tell us that during 1 year, among 10,000 post-menopausal women with a uterus who are taking estrogen plus progestin, *8 more will have invasive breast cancer, 7 more will have a heart attack, 8 more will have a stroke, and 18 more will have blood clots, including 8 with blood clots in the lungs,* than will a similar group of 10,000 women not taking these hormones. This is a relatively small annual increase in risk for an individual woman. Individual women who have participated in the trial and women in the population who have been on estrogen and progestin should not be unduly alarmed. However, even small individual risks over time, and on a population-wide basis, add up to *tens of thousands of these serious adverse health events.* (Emphasis added.)

238.     Within a week after the WHI results were reported, another article appeared in JAMA related to the risk of long-term use of estrogen-only therapy. On July 17, 2002, JAMA published a NCI study, which found that women who took estrogen were more likely to develop ovarian cancer than those not on the hormone.

239.    In the study, researchers from the NCI followed 44,241 women for 19 years who were taking estrogen only and found that these women had a 60% higher risk of ovarian cancer than women who had never used estrogen. The risk increased proportionately with longer duration of estrogen use. Women who took estrogen for 10 to 19 years had an 80% higher risk than those who did not take the pills. Those on the hormone therapy for 20 years or more were three times as likely to develop ovarian cancer as women who did not take it at all. Most of the NCI participants used Wyeth's brand of estrogen therapy, Premarin.

240.    Lead author of the NCI study, James V. Lacey, summarized the results of his study with the following statement:

> The main finding of our study was that post-menopausal women who used estrogen replacement therapy for 10 or more years were at significantly higher risk of developing ovarian cancer than women who never used hormone replacement therapy.

241.    Dr. Lacey further underscored the implications of his NCI study, by explaining that the findings translate into one or two additional ovarian cancers each year per 10,000 women taking estrogen alone. In 2000, eight million American women took Premarin, the leading estrogen therapy pill. The Lacey study demonstrates that Premarin usage is responsible for up to 1,600 additional ovarian cancer cases in the year 2000 alone.

242.    In October 2003, the WHI study produced a report with findings similar to the NCI study regarding ovarian cancer. The October 1, 2003, issue of JAMA reported that combination hormone therapy was also associated with increased risk for ovarian cancer: the WHI investigators found that women randomized to received combined hormone therapy (i.e., estrogen plus progestin) experienced a 58% increase in ovarian cancer rates.

## C.    The Aftermath of the WHI and NCI Studies

243.    The WHI and NCI studies received enormous media coverage: front-page newspaper

headlines, magazine covers, and broadcast news programs urgently reported the alarming and significant findings.

244.    Commenting on the WHI study, Dr. Leslie Ford, associate director for clinical research at the NCI's Division of Cancer Prevention, re-emphasized the risk of hormone therapy to patients:

> The reduction in colorectal cancer risk in the WHI is intriguing, but the balance of harm versus benefit does not justify any woman beginning or continuing to take estrogen plus progestin for this purpose.

245.    Dr. Isaac Schiff of Massachusetts General Hospital also commented on the WHI study, noting, "Quality of life is very, very important . . .. From a heart and breast cancer point of view, the drug should be outlawed.  But for hot flashes, there's nothing better."

246.    The WHI and NCI study conclusions regarding the unsafe and dangerous adverse effects of hormone therapy have been verified by subsequent published research.  A study on hormone therapy and breast carcinoma risk in Hispanic and non-Hispanic women, reported on September 1, 2002, in the journal Cancer, found that those Hispanic post-menopausal women have significantly increased breast cancer risk after long-term hormone therapy.

247.    On October 23, 2002, the United Kingdom's Medical Research Council announced that it had ended a clinical study of the risks and benefits of long-term use of hormone therapy for "scientific and practical reasons."  5,700 women were enrolled in the "WISDOM" study (the Women's International Study of Long Duration Estrogen after Menopause).  The study was to include 22,000 women.  However, following the WHI study, the WISDOM study was canceled. The Medical Research Council concluded "There is strong evidence that taking hormone therapy long term increases the risks of some diseases such as breast cancer and decreases the risks of others such as osteoporosis."

248.    Because of the significance of its findings, on March 17, 2003, the New England

Journal of Medicine (NEJM) released a follow-up WHI study two-months in advance of its May

8th publication date.  The follow-up study reported that hormone therapy failed to improve the

quality of life for menopausal women.

249.    The Quality of Life study which examined the same pool of 16,000 women as the

July 9, 2002, WHI study, found that hormone therapy drugs do not do the very thing many

women took them for in the first place— that is, to make them feel happier and healthier after

menopause.  A comparison of women who took hormone therapy to women given a placebo

showed those women taking hormones did not report sleeping better or feeling better.  The

hormone therapy group also did not report less depression or more sexual satisfaction than the

placebo group.

250.    According to the study's lead author, Dr. Jennifer Hays:  "It's just not something

that's going to make most women feel better.  Even if it reduces your symptoms, that's not going

to translate into a meaningful effect on a quality of life."  Dr. Deborah Grady of the University of

California, San Francisco, in an accompanying commentary in the same issue of the NEJM said

that:  "There is no role for hormone therapy in the treatment of women without menopausal

symptoms" and that only women who were experiencing debilitating menopausal symptoms

should take hormone therapy.  She stated that those women who do continue with hormone

therapy should take the lowest possible dose for the shortest possible time.

251.    On May 21, 2003, JAMA published another study studying the efficacy of estrogen

plus progestin therapy (e.g., Prempro) for prevention of bone loss in elderly women.  The study

involved 373 women ages 65 to 90 who had either thinning bones or full-blown osteoporosis and

took one of four treatments for three years:  (i) combination hormone therapy alone, (ii) a bone-

building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.

252.    While the study found that the combination of hormone therapy and Fosamax was effective at treatment and prevention of post-menopausal osteoporosis, it also concluded that Fosamax alone was more effective than combination hormone therapy alone.  After three years, hip bone density had increased nearly 6 percent in women on hormone therapy with Fosamax, 4 percent in those on Fosamax alone, and 3 percent in the hormones-only group.

253.    Dr. Jennifer Hays, a WHI researcher and lead author of the May 8, 2003, JAMA study on hormone therapy and quality of life, said that the findings of the bone-loss study are not convincing enough to recommend hormone therapy for osteoporosis prevention even in older women, especially because the study showed that the bone-enhancing benefits from estrogen come only after long-term use which also carries the highest risk of breast cancer or heart disease.

254.    On May 28, 2003, JAMA published yet another study on the effects of hormone therapy, this time focusing on the risk of Alzheimer's disease and other types of dementia.  The study found that combination hormone therapy, consisting of both estrogen and progestin, doubled the risk of dementia for woman who started hormones at age 65 or older.

255.    The dementia study was based on a four-year experiment involving 4,532 women at 39 medical centers, where half took placebos and half took Prempro.  In four years, there were 40 cases of dementia in the Prempro group and 21 in the placebo group.  Translated to an annual rate for the population-at-large, the results mean that for every 10,000 women 65 and older taking hormone therapy, there will be 45 cases of dementia a year with 23 of them attributable to hormone use.

256.    Dr. Sally A. Shumaker, the director of the dementia study and a professor of public health sciences at Wake Forest University, stated that the study's "clear message is that there's no reason for older women to be taking combination hormone therapy."

257.    On June 25, 2003, JAMA published still another study analyzing the data from the Women's Health Initiative, which found that in addition to stimulating the growth of breast cancer, combination hormone therapy makes breast tumors harder to detect, leading to dangerous delays in diagnosis. The report found that breast abnormalities could develop soon after a woman starts taking hormone therapy. Consequently, the study's findings raise questions about the safety of even short-term hormone use. In the same June 25, 2003, issue that reported this study, JAMA also published an editorial by Dr. Peter H. Gann, a cancer epidemiologist at Northwestern University, who stated that this study represents "further compelling evidence against the use of combination estrogen plus progestin hormone therapy."

258.    The connection between hormone therapy usage and breast cancer found in the WHI studies were confirmed by a similar study conducted in the United Kingdom. The August 9, 2003, issue of *Lancet* reported on the conclusions reached by *The Million Women Study* — a major research effort funded by Cancer Research UK — confirming that current and recent use of hormone therapy increases a woman's chance of developing breast cancer, and that the risk increases with duration of use. Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64. Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100 per cent increase).

259.    In the August 7, 2003, issue of *NEJM*, the WHI study continued to yield important information regarding the safety of hormone therapy use. The study found that combination

hormone therapy does not protect the heart and may even increase the risk of coronary heart disease (CHD). Specifically, the WHI study found that combination hormone therapy usage was associated with a 24% overall increase in the risk of CHD (6 more heart attacks annually per 10,000 women using combination therapy) and a 81% increased risk of CHD in the first year after starting combination therapy.

260.    In addition to the studies published in *JAMA, NEJM,* and other medical journals, a recent federal agency report also revealed that estrogen could be dangerous to women taking it as hormone therapy. On December 11, 2002, the National Institute of Environmental Health Sciences released its tenth annual report on carcinogens, which declared for the first time that estrogen is now on the federal government's list of "known human carcinogens."

### D.    Wyeth Changes Hormone Labels and Reverses Long-Term Marketing Strategy

261.    In light of the WHI and NCI studies and other subsequent research reports, the labels provided by Wyeth for its Premarin and Prempro drugs were inadequate, misleading, and inaccurate. In fact, Wyeth changed warning labels on Premarin and Prempro during the last week of August 2002 to reflect the results of the July 2002 WHI and NCI studies.

262.    Prior to the label change in August 2002, the Premarin warning label made no mention whatsoever of ovarian cancer.

263.    The Prempro label warnings were likewise inadequate prior to August 2002. As to breast cancer, the Prempro warning explains the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro), but then adds, with regard to the effect of added progestins on the risk of breast cancer: "The overall incidence of breast cancer does not exceed that expected in the general population." The WHI study plainly reveals that this warning is false and was known or should have been known by Wyeth to be false for decades.

264.    The Prempro warnings were also inadequate for two thromboembolic disorders, pulmonary embolisms and blood clots: "The increased risk [of venous thromboembolism] was found only in current ERT [i.e., Premarin only] users." Furthermore, as to cardiovascular disease (heart attacks and strokes), the Prempro warning reads simply "Embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risk.

265.    Under precautions, the Prempro label acknowledges: "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied." Nevertheless, Wyeth has long promoted the supposed benefits of long term hormone therapy for cardiovascular disease.

266.    On January 6, 2003, Wyeth abandoned its long-standing marketing strategy of promoting the long-term use of Premarin and Prempro. Wyeth announced the reversal of its long-held promotional message in a "Dear Doctor" letter to Health Care Professionals that explained it was adopting new labeling for its hormone therapy drugs in light of the WHI findings.

267.    According to the January 6, 2003, "Dear Doctor" letter, the labeling changes included boxed warnings:

> [W]hich state that estrogens and estrogens plus progestin therapies should not be used for prevention of cardiovascular disease . . . The boxed warning also includes information [stating that because of the WHI study] . . . estrogens and estrogens plus progestin *should be prescribed for the shortest duration consistent with treatment goals.* (Emphasis added.)

268.    In early June 2003, Wyeth commenced a new public marketing campaign with a full-page advertisement placed in 180 newspapers nationwide. The advertisement, styled "A Message from Wyeth," disclosed that Wyeth was abandoning its decades long strategy of

promoting long-term usage of Premarin and Prempro for post-menopausal women for a variety

of conditions.

> Hormone therapy is not a lifelong commitment. [¶] As a result of recent studies,
> we know that hormone therapy should not be used to prevent heart disease. These
> studies also report an increased risk of heart attack, stroke, breast cancer, blood
> clots, and dementia. Therefore, it is recommended that hormone therapy
> (estrogen, either alone or with progestin) ***should be taken for the shortest
> duration*** at the lowest effective dose.

(*Philadelphia Inquirer*, June 1, 2003, at C6; emphasis added).

269.    Wyeth had recklessly and willfully failed to conduct adequate pre-approval research

and post-approval surveillance to establish the safety of long-term hormone therapy.

Nonetheless, Wyeth had vigorously promoted long term hormone therapy use. The studies,

which the WHI and NCI conducted, could have and should have been conducted many years ago

by Wyeth-- and before embarking on its long-term usage marketing campaign. Had it conducted

the necessary studies and diligent post-marketing surveillance, Wyeth would have learned years

ago that hormone therapy causes cardiovascular diseases, is marginally effective in preventing

bone loss, does not promote well being, causes a number of cancers and dementia, and is even

harmful on a short-term basis by increasing the risk of breast cancer.

### III.  FRAUDULENT CONCEALMENT

270.    Any applicable statutes of limitations have been tolled by the knowing and active

concealment and denial of the facts as alleged herein by Defendants. Plaintiffs have been kept in

ignorance of vital information essential to the pursuit of these claims, without any fault or lack of

diligence on their part.

271.    Defendants are and were under a continuing duty to disclose the true character,

quality, and nature of their hormone therapy drugs to Plaintiffs. Because of its concealment of

the true character, quality and nature of their hormone therapy drugs, Defendants are estopped

from relying on any statute of limitations defense.

## COUNT ONE
### Negligence

272.    Plaintiffs incorporate by reference herein all paragraphs and allegations of this Complaint as though fully set forth herein, and state and allege as follows:

273.    Defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of the hormone therapy drugs into the stream of commerce, including a duty to assure that their products did not cause users to suffer from foreseeable unreasonably dangerous side effects and serious health problems.

274.    Defendants failed to exercise ordinary care in the manufacture, sale, testing, marketing, quality, assurance, quality control and/or distribution of the hormone therapy drugs into interstate commerce in that Defendants knew or should have known that the hormone therapy drugs created a foreseeable high risk of unreasonably dangerous side effects and health hazards such as an increased risk of cardiovascular disease as well as the risk of invasive breast cancer, pulmonary embolism, blood clots, stroke, and heart attack.

275.    Defendants were negligent in the design, manufacture, testing, advertising, warning, marketing and sale of the hormone therapy drugs in that they:

    a.    Failed to use reasonable care in designing and manufacturing the hormone therapy drugs so as to avoid the aforementioned risks to individuals when the hormone therapy drugs were being used;

    b.    Failed to accompany the hormone therapy drugs with proper warnings regarding all possible adverse side effects and health risks associated with the use of the hormone therapy drugs and the comparative severity and duration of such adverse effects;

c.   Failed to give warnings accurately reflecting the symptoms, scope or severity of the side effects and health risks;

d.   Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the hormone therapy drugs;

e.   Failed to provide adequate training or information to medical care providers for the appropriate use of the hormone therapy drugs;

f.   Failed to adequately warn consumers and medical prescribers (but instead actively encouraged the sale of the hormone therapy drugs) about the following:

    i.   The need for comprehensive, regular medical monitoring to ensure early discovery of adverse events,

    ii.   The possibility of death and/or having to undergo surgery,

    iii.   That such surgery may cause extraordinary suffering and/or death, and

    iv.   That the health risks posed by the hormone therapy drugs may become debilitating, difficult, and painful, necessitating lengthy surgery and/or repeated visits to the doctor, clinic or hospital.

g.   Failed to adequately test and/or warn about the use of the hormone therapy drugs, including, without limitation, the possible adverse side effects and health risks caused by the use of the hormone therapy drugs;

h.   Failed to adequately warn users, consumers and physicians about the severity, scope and likelihood of adverse events and related dangerous conditions to individuals taking the hormone therapy drugs;

i.   Represented to physicians, including, but not limited to, Plaintiffs' prescribing physicians, that the drugs were safe and effective for use and for use longer than one year;

j.     Failed to adequately, timely, and promptly relay information to the prescribing physicians or ultimate users of the serious health effects of the hormone therapy drugs, once Defendants were made aware of same through Adverse Drug Experience reports; and

k.     Were otherwise careless or negligent.

276.    Despite the fact that Defendants knew or should have known that the hormone therapy drugs caused unreasonable, dangerous side effects and posed potentially fatal health risks which many users would be unable to remedy by any means, Defendants continued to market the hormone therapy drugs to prescribing physicians and consumers, including Plaintiffs, when there were safer alternative methods of treatment available for their conditions.

277.    Defendants knew or should have known that consumers such as the Plaintiffs would suffer serious injury as a result of Defendants' failure to exercise ordinary care as described.

278.    Likewise, Defendants were negligent and acted intentionally or with malice in ever seeking approval for the sale of the hormone therapy drugs given Defendants' knowledge of the dangers associated with the hormone therapy drugs.

279.    Further, because of the breach of duty and negligent conduct of Defendants in the manner set forth above, the Plaintiffs have sustained general and special damages.  Specifically, as a direct result of the negligence and wrongful conduct of the Defendants, and each of them, Plaintiffs have suffered and continue to suffer great pain of mind and body, shock, emotional distress, loss of enjoyment of life, were prevented and continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; have sustained loss of earnings and of earning capacity; and have incurred and will continue to incur expenses for medical and/or psychological treatment, therapy and counseling.  The acts and omissions of Defendants, in the

manner described above, were the direct and proximate cause of Plaintiffs' damages. Therefore, Plaintiffs have causes of action in negligence against Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00).

### COUNT TWO
### Strict Liability

280.    Plaintiffs incorporate by reference herein all paragraphs and allegations of this Complaint as though fully set forth herein, and state and allege as follows:

281.    The drug products previously described were in a defective condition unreasonably dangerous for their intended use at the time of their manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution in that, and not by way of limitation, said products and their warnings, instructions, and directions failed to warn of the dangerous propensities of said products, which risks were known or reasonably scientifically knowable to Defendants. Defendants, and each of them, knew or should have known of the defective condition, characteristics and risks associated with said products, as previously set forth herein.

282.    At all times herein mentioned, the defects in the aforementioned products existed when the products left the Defendants' control, and Defendants, and each of them, knew that the products were to be used by the user without inspection for defects therein. Moreover, Plaintiffs neither knew, nor had reason to know at the time of the use of the subject products, of the existence of aforementioned defects. Further, Plaintiffs used the products without substantial change in condition in the products between the time of design and manufacture of the products and the time Plaintiffs used the products as directed.

283.    As a proximate result of the defective condition of the aforementioned products, Plaintiffs suffered injuries and damages as alleged herein. Therefore, Plaintiffs have a cause of

action against Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT THREE
### Breach Of Implied Warranty

284.    Plaintiffs incorporate by reference herein all paragraphs and allegations of this
Complaint as though fully set forth herein and state and allege as follows:

285.    Prior to the time that the aforementioned products were used by Plaintiffs,
Defendants, and each of them, impliedly warranted to Plaintiffs, their agents and physicians, that
said products were of merchantable quality and safe and fit for the use for which they were
intended.

286.    Plaintiffs were and are unskilled in the research, design and manufacture of the
aforementioned products and reasonably relied entirely on the skill, judgment and implied
warranty of Defendants, in that the hormone therapy drugs had dangerous propensities when put
to their intended use and would cause severe injuries to the user.

287.    Defendants breached their implied warranty that the products were fit for the use
intended. The aforementioned products were neither safe for their intended use nor of
merchantable quality, as warranted by Defendants, in that they had dangerous propensities when
put to their intended use and would cause severe injuries to the user.

288.    The aforementioned breach of implied warranties by Defendants, and each of them,
proximately caused Plaintiffs to suffer injuries and damages as alleged herein.  Therefore,
Plaintiffs have a cause of action against Defendants in an amount in excess of Fifty Thousand
Dollars ($50,000.00).

## COUNT FOUR
### Breach Of Express Warranty

289.    Plaintiffs incorporate by reference herein all paragraphs and allegations of this

Complaint as though fully set forth herein, and state and allege as follows::

290.    At all times herein mentioned, Defendants expressly warranted to Plaintiffs, their agents and physicians, by and through statements made by Defendants, orally and in written publications, packaged inserts, and other written materials intended for physicians, medical patients, and the general public, that the aforementioned products were safe, effective, fit and proper for their intended use.

291.    In utilizing the aforementioned products, Plaintiffs relied on the skill, judgment, representations and foregoing express warranties of Defendants, and each of them.  Said warranties and representations were false in that the aforementioned products were not safe and were unfit for the uses for which they were intended.

292.    The foregoing breach of express warranties by Defendants, and each of them, proximately caused Plaintiffs to suffer the injuries and damages as alleged herein.  Therefore, Plaintiffs have a cause of action against Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT FIVE
### Fraud

293.    Plaintiffs incorporate by reference herein all paragraphs and allegations of this Complaint as though fully set forth herein, and state and allege as follows:

294.    Defendants, and each of them, from the time that the aforementioned products were first manufactured, marketed and distributed, and up to the present, willfully deceived Plaintiffs by concealing the true facts concerning the hormone therapy drugs, which Defendants, as manufacturers, marketers, and distributors of the products, had a duty to disclose to Plaintiffs.

295.    Defendants willfully deceived Plaintiffs with the intent to induce Plaintiffs to use the hormone therapy drugs.

296.    Defendants represented and suggested as a fact to Plaintiffs and their physicians that the hormone therapy drugs were safe when this representation was false; and/or Defendants asserted that the hormone therapy drugs were safe without knowing whether the representation was true or false.

297.    The representations related to past and/or present facts, namely, that the hormone therapy drugs had been proven to be safe and that Plaintiffs would not be harmed by taking the drugs.

298.    The fact that the hormone therapy drugs were defective was material to Plaintiffs' health and safety.

299.    At all times herein mentioned, Defendants, and each of them, conducted a sales and marketing campaign to promote the sale of the aforementioned drug products and willfully deceived Plaintiffs, their physicians, and the general public as to the health risks and consequences of the use of the aforementioned products. Defendants, and each of them, were aware of the foregoing and that the aforementioned products were not safe, fit, and effective for human consumption, that the use of said products was hazardous to health, and that said products had a serious propensity to cause significant injuries to users, including, but not limited to, the injuries suffered by Plaintiffs as delineated herein.

300.    The dangers to Plaintiffs' health and well-being existing in the hormone therapy drugs was susceptible of knowledge on Defendants' part, in that they had the resources and the responsibility to research the drugs and conduct follow-up and on-going studies of the effects of the drugs on consumers, just as independent agencies conducted research and studies and learned of the hazards inherent in hormone therapy drugs.

301.    Defendants, with the intent to defraud and mislead, intentionally concealed and

suppressed the true facts concerning the hormone therapy drugs. Defendants knew that Plaintiffs' physicians would not prescribe the subject products, and Plaintiffs would not have used the subject products, if they were aware of the true facts concerning the dangers of said products.

302.   In reliance on the Defendants' failure to disclose the dangers posed by hormone therapy drugs, Plaintiffs were induced to purchase and use the aforementioned products. If Plaintiffs had known the true facts and the facts concealed by Defendants, they would not have used the subject products. Plaintiffs' reliance on Defendants' failure to disclose was justified because the failure to disclose the true facts was committed by individuals and entities that were in a position to know the true facts.

303.   As a direct and proximate result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiffs suffered injuries and damages as alleged herein. Therefore, Plaintiffs have a cause of action against Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT SIX
### Negligent Misrepresentation

304.   Plaintiffs incorporate by reference herein all paragraphs and allegations of this Complaint as though fully set forth herein, and state and allege as follows:

305.   Defendants, and each of them, made false representations, as previously set forth herein, to Plaintiffs, Plaintiffs' physicians, and the general public, including, but not limited to, the misrepresentation that the hormone therapy drugs were safe, fit and effective for human consumption. At all times herein mentioned, Defendants, and each of them, conducted a sales and marketing campaign to promote the sale of the aforementioned drug products and willfully deceived Plaintiffs, Plaintiffs' physicians, and the general public as to the health risks and

consequences of using the hormone therapy drugs.

306.   Defendants made the foregoing representations without any reasonable grounds for believing them to be true.  These representations were made directly by Defendants to physicians, medical patients and the public with the intention of inducing reliance and the prescription, purchase, and use of the hormone therapy drugs.  Defendants had a duty to exercise reasonable care in making representations about the safety of the hormone therapy drugs to Plaintiffs, their treating physicians, and the public.

307.   Defendants, and each of them, breached their duty to exercise reasonable care by negligently representing that the hormone therapy drugs were safe and fit for the use intended when Defendants knew or should have known that such representations were false.

308.   The foregoing representations by Defendants, and each of them, were in fact false in that the hormone therapy drugs were not safe, fit, and effective for human consumption, that the use of said products was hazardous to health, and that said products had a serious propensity to cause significant injuries to users, including, but not limited to, the injuries which ultimately caused Plaintiffs' injuries as delineated herein.

309.   The foregoing misrepresentations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of the subject products by the public, including Plaintiffs.

310.   In reliance on the misrepresentations by Defendants, and each of them, Plaintiffs were induced to purchase and use the aforementioned products. If Plaintiffs had known of the true facts and the facts concealed by Defendants, they would not have used the subject products.  The reliance of Plaintiffs upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position

to know the true facts.

311.     As a result of the foregoing negligent misrepresentation by Defendants, and each of them, Plaintiffs suffered injuries and damages as alleged herein.  Therefore, Plaintiffs have a cause of action against Defendants in amount in excess of Fifty Thousand Dollars ($50,000.00).

<u>**COUNT SEVEN**</u>
**Violation Of The False And Misleading Advertising Act,**
**The Minnesota Prevention Of Consumer Fraud Act And**
**The Uniform Deceptive Trade Practices Act**

312.     Plaintiffs incorporate by reference herein all paragraphs and allegations of this Complaint as though fully set forth herein, and state and allege as follows:

313.     By reason of the conduct as alleged herein, Defendants violated the provisions of Minnesota Statutes sections 325D.44, 325F.67 and 325F.69 by knowingly and intentionally inducing Plaintiffs to use the hormone therapy drugs through the use of false and/or misleading advertising, representations and statements.  The products failed to perform as represented and advertised, and in fact were unsafe.

314.     As a direct and proximate result of Defendants' statutory violations, Plaintiffs used the hormone therapy drugs as a means of hormone replacement therapy, which Plaintiffs would not have used had Defendants not issued false and/or misleading advertising, representations and statements.

315.     By reason of such violations and pursuant to Minnesota Statutes section 8.31 subdivision 3a, section 325D.44, section, section 325F.67 and sections 325F.68-70, Plaintiffs are entitled to recover all of the monies paid for the products; to be compensated for the cost of medical care arising out of the use of the products; together with any and all other consequential damages recoverable under the law including, but not limited to, past medical expenses, past wage loss, past pain, suffering, disability and emotional distress.

316.   In addition, pursuant to Minnesota Statutes section 8.31, Plaintiffs are entitled to recover costs and disbursements, including costs of investigation, reasonable attorneys' fees, and any other equitable relief as determined by this Court.

WHEREFORE, Plaintiffs, and each of them, demand judgment against the Defendants, and each of them, in an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00), together with interest, costs and disbursements, reasonable attorneys' fees, and such other and further relief as the Court deems just and equitable.

Dated: 7/2/08

JEFF ANDERSON & ASSOCIATES, P.A.

Jeff Anderson, Bar # 2057
JEFF ANDERSON & ASSOCIATES, P.A.
366 Jackson Street, Suite 100
St. Paul, MN 55101
Tel:  651-227-9990
Fax:  651-297-6543

and

*(Pro Hac Vice Pending)*
Thomas V. Girardi, CA Bar # 36603
Howard B. Miller, CA Bar # 31392
J. Paul Sizemore, CA Bar # 254981
Joseph C. Gjonola, CA Bar # 241955
Jennifer A. Lenze, CA Bar # 246858
GIRARDI | KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Tel:  213-977-0211
Fax:  213-481-1554

*(Pro Hac Vice Pending)*
Daniel S. Gruber, CA Bar # 113351
GRUBER & GRUBER
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel:  (818) 981-0066
Fax:  (818) 981-2122

*(Pro Hac Vice Pending)*
Howard A. Snyder, CA Bar # 113637
LAW OFFICES OF HOWARD SNYDER
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA, 91403
Tel:  (818) 461-1790
Fax:  (818) 461-1793

**ATTORNEYS FOR PLAINTIFFS**

### ACKNOWLEDGEMENT

   The undersigned hereby acknowledges that sanctions, including costs, disbursements, and reasonable attorney fees, may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

60

Dorothy Allen, et. al., Plaintiff(s)
vs.
Wyeth, et al, et. al., Defendant(s)

Service of Process by



**APS International, Ltd.**
**1-800-328-7171**

Law Firm Requesting Service:

# AFFIDAVIT OF SERVICE ON A CORPORATION
—Wyeth

JEFF ANDERSON & ASSOCIATES, P.A.
Ms. Therese Treichel
366 Jackson Street, Suite 100
St. Paul, MN 55101

Court Case No. _____

Customer File:

State of: **DELAWARE** ) ss.
County of: **NEW CASTLE** )

**Name of Server:** **Adam Golden** , undersigned, being duly sworn, deposes and says that at the time of service, s/he was over the age of twenty-one, was not a party to this action;

**Date/Time of Service:** that on **07-Jul-2008 02:20 pm**

**Place of Service:** at **2711 Centerville Road, Suite 400** , city of **Wilmington** , state of **DE**

**Documents Served:** the undersigned served the documents described as:
**Summons and Complaint**

**Service of Process on, Person Served, and Method of Service:** A true and correct copy of the aforesaid document(s) was served on:
**Wyeth**
By delivering them into the hands of an officer or managing agent whose name and title is
**Dionne Mills, Authorized to Accept**

**Description of Person Receiving Documents:** The person receiving documents is described as follows:
Sex **F** ; Skin Color **black** ; Hair Color **black** ; Facial Hair
Approx. Age **35** ; Approx. Height **5'05"** ; Approx. Weight **120**
☑ To the best of my knowledge and belief, said person was not engaged in the US Military at the time of service.

**Signature of Server:** Undersigned declares under penalty of perjury that the foregoing is true and correct.

Signature of Server

Subscribed and sworn to before me this
**7** day of _____ 20 **08**

Notary Public                    (Commission Expires)

APS International, Ltd.
APS International Plaza · 7800 Glenroy Rd.
Minneapolis, MN 55439-3122

APS File: 90638-1

STATE OF MINNESOTA

COUNTY OF HENNEPIN

**AFFIDAVIT OF SERVICE**

**METRO LEGAL SERVICES**

Leif O. Hanson, being duly sworn, on oath says:
that on July 3, 2008, at 11:45 AM he served the attached:

Summons, Complaint, & Exhibits upon:

Pfizer Inc., therein named, personally at:

100 South 5th Street, #1075, Minneapolis, County of Hennepin, State of Minnesota, by
handing to and leaving with Jenny Schurhamer, Agent for C.T. Corporation Systems,
Inc., authorized to accept service, the registered agent for service for said Pfizer Inc., a
true and correct copy thereof.

Subscribed and sworn to before me on
_____7/9_____ , 2008

ROBERT D. YATES
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2012

901957 - 1

RE: HRT (Allen v Wyeth)

STATE OF MINNESOTA

COUNTY OF HENNEPIN

AFFIDAVIT OF SERVICE

METRO LEGAL SERVICES

Leif O. Hanson, being duly sworn, on oath says:
that on July 2, 2008, at 11:45 AM he served the attached:

Summons, Complaint, & Exhibits upon:

Pharmacia & Upjohn Company, therein named, personally at:

100 South 5th Street, #1075, Minneapolis, County of Hennepin, State of Minnesota, by
handing to and leaving with Jenny Schurhamer, Agent for C.T. Corporation Systems,
Inc., authorized to accept service, the registered agent for service for said Pharmacia &
Upjohn Company, a true and correct copy thereof.



Subscribed and sworn to before me on
_____ 7/9 _____, 2008

ROBERT D. YATES
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2012

901957 - 2

RE: HRT (Allen v Wyeth)

**STATE OF MINNESOTA**

**COUNTY OF HENNEPIN**

                                                          **AFFIDAVIT OF SERVICE**

**METRO LEGAL SERVICES**

Leif O. Hanson, being duly sworn, on oath says:
that on July 3, 2008, at 11:45 AM he served the attached:

Summons, Complaint, & Exhibits upon:

Pharmacia Corporation, therein named, personally at:

100 South 5th Street, #1075, Minneapolis, County of Hennepin, State of Minnesota, by
handing to and leaving with Jenny Schurhamer, Agent for C.T. Corporation Systems,
Inc., authorized to accept service, the registered agent for service for said Pharmacia
Corporation, a true and correct copy thereof.

Subscribed and sworn to before me on

_____7/9_____, 2008

ROBERT D. YATES
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2012

901957 - 3

RE: HRT (Allen v Wyeth)

Dorothy Allen, et. al., Plaintiff(s)
vs.
Wyeth, et al, et. al., Defendant(s)



Service of Process by
APS International, Ltd.
1-800-328-7171

**Law Firm Requesting Service:**

JEFF ANDERSON & ASSOCIATES, P.A.
Ms. Therese Treichel
366 Jackson Street, Suite 100
St. Paul, MN 55101
Customer File:

## AFFIDAVIT OF SERVICE ON A CORPORATION
--Barr Laboratories
Court Case No. _____

State of: **DELAWARE** ) ss.
County of: **NEW CASTLE** )

| | |
|---|---|
| **Name of Server:** | **Adam Golden** , undersigned, being duly sworn, deposes and says that at the time of service, s/he was over the age of twenty-one, was not a party to this action; |
| **Date/Time of Service** | that on **07-Jul-2008 02:20 pm** |
| **Place of Service:** | at **2711 Centerville Road, Suite 400** , city of **Wilmington** , state of **DE** |
| **Documents Served:** | the undersigned served the documents described as: **Summons and Complaint** |
| **Service of Process on, Person Served, and Method of Service:** | A true and correct copy of the aforesaid document(s) was served on: **Barr Laboratories** By delivering them into the hands of an officer or managing agent whose name and title is **Dionne Mills, Authorized to Accept** |

**Description of Person Receiving Documents:**

The person receiving documents is described as follows:
Sex **F** ; Skin Color **black** ; Hair Color **black** ; Facial Hair
Approx. Age **35** ; Approx. Height **5'05"** ; Approx. Weight **120**

☑ To the best of my knowledge and belief, said person was not engaged in the US Military at the time of service.

**Signature of Server:**

Undersigned declares under penalty of perjury that the foregoing is true and correct.

_Signature of Server_

APS International, Ltd.
APS International Plaza · 7800 Glenroy Rd.
Minneapolis, MN 55439-3122

Subscribed and sworn to before me this
____ day of _____, 20 08

_Notary Public_                    (Commission Expires)

ANNE _____
EXPIRES
MARCH 14, 2011
NOTARY PUBLIC
STATE OF DELAWARE

APS File: 90638-1

Dorothy Allen, et al, et. al., Plaintiff(s)
vs.
Wyeth, et al, et. al., Defendant(s)



Service of Process by
**APS International, Ltd.**
**1-800-328-7171**

APS International Plaza
7800 Glenroy Road
Minneapolis, MN 55439-3122

APS File #:  090638-0002

## AFFIDAVIT OF SERVICE -- Corporate

Service of Process on:
--Greenstone, Ltd., The Corporation Trust Company

Court Case No. _____

**JEFF ANDERSON & ASSOCIATES, P.A.**
**Ms. Therese Treichel**
**366 Jackson Street, Suite 100**
**St. Paul, MN 55101**

State of: <u>DELAWARE</u>                      ) ss.
County of: <u>NEW CASTLE</u>                   )

| | |
|---|---|
| Name of Server: | <u>ADAM GOLDEN</u>, undersigned, being duly sworn, deposes and says that at the time of service, s/he was of legal age and was not a party to this action; |
| Date/Time of Service: | that on the <u>7th</u> day of <u>July</u>, 20 <u>08</u>, at <u>2:20</u> o'clock <u>P</u>. M |
| Place of Service: | at <u>Corporation Trust Center</u>, in <u>Wilmington, DE  19801</u><br><u>1209 Orange Street</u> |
| Documents Served: | the undersigned served the documents described as:<br>**Summons and Complaint** |
| Service of Process on: | A true and correct copy of the aforesaid document(s) was served on:<br>**Greenstone, Ltd., The Corporation Trust Company** |
| Person Served, and Method of Service: | By delivering them into the hands of an officer or managing agent whose name and title is: <u>SCOTT LASCALA, SECTION HEAD PROCESS</u> |
| Description of Person Receiving Documents: | The person receiving documents is described as follows:<br>Sex <u>M</u> ; Skin Color <u>WHITE</u> ; Hair Color <u>BROWN</u> ; Facial Hair<br>Approx. Age <u>30's</u> ; Approx. Height <u>6'</u> ; Approx. Weight <u>230 lbs</u> |

☒ To the best of my knowledge and belief, said person was not engaged in the US Military at the time of service.

Signature of Server:   Undersigned declares under penalty of perjury that the foregoing is true and correct.

_____
Signature of Server

**APS International, Ltd.**

Subscribed and sworn to before me this
7th   day of   Ju...

_____
Notary Public

(Commission Expires)
EXPIRES
MARCH 14, 2011
STATE OF DELAWARE
NOTARY PUBLIC

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Personal Injury

---

DOROTHY ALLEN, JUDITH ALLEN, LORETTA ANDREWS,
JANET ARBOGAST, KAREN AWALD,
CAROL BANNERMAN, PHYLLIS BARNES, JOANNE
BARRETT, BETTY BETHEA, JOANNE BLACK, MARY
BOWDEN, HAZEL BURGESS, JOYCE BURPEE, VIRGINIA
CAMPBELL, ADRIANNE CARRERA, LOIS CARTER,
MARGARET CHAMNESS, MARY CHRISCO, PEGGY
CLEMONS, SALLY COLLINS, BARBARA COUCH, MARY
DAWSON, LOIS DUFFY, LINDA EELLS, RACHEL EPSTEIN,
FRANCES FARR, MARJORIE FLAMAN, MARGARET
FOLTZ, WANDA FOLTZ, DELOIS FOSTER, JO GARRISON
O'NEIL, SHARON HAEMKER, MARGARET HARRIS,
LOUISE HESS, WANDA HINCEMAN, MARGUERITE
HJALMARSON, ALICE HOLTZMAN, RITA HREN, NANCY
HUNTER, YVONNE HUTCHINSON, GLENDA IVEY, DORIS
JEROME, GRACE KIGER, PATSY ANDERSON, JUANITA
BROUWER, NATA CARGAN, NANCY JO CARTER, JAN
COSTA RYDJESKE, WILMA COWART, PATRICIA
FERNAU, ISABEL FRAGOSO, DORIS GIST, HELEN PENNY
AROS, PATRICIA BRUNNER, JOAN CASTO, MARIAN
CONNER, JANET EDWARDS, WILMA FAULKNER,
NANCY KATTE, NAN MAURY;

Court File No:

        Plaintiffs,

vs.

WYETH and its divisions WYETH PHARMACEUTICALS,
INC. and ESI LEDERLE; PFIZER INC.; PHARMACIA &
UPJOHN COMPANY; PHARMACIA CORPORATION; BARR
LABORATORIES, INC.; MEAD JOHNSON & COMPANY;
GREENSTONE, LTD.; and DOES 1-10, inclusive,

        Defendants.

---

## **CERTIFICATE OF REPRESENTATION AND PARTIES**

Pursuant to Rule 104 of the General Rules of Practice for District Courts, this form must be

completed and filed with the Court Administrator's Office at the time the case is filed.   The

court administrator shall, upon receipt of the completed certificate, notify all parties or their

lawyers of the date of filing the action and the file number assigned.

LIST ALL LAWYERS/PRO SE PARTIES INVOLVED IN THIS CASE.

**<u>ATTORNEYS FOR PLAINTFFS</u>**
Jeffrey R. Anderson, #2057
Kathleen O'Connor, #184834
JEFF ANDERSON & ASSOCIATES, P.A.
E-1000 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 227-9990
Fax:   (651) 297-6543

**(Pro Hac Vice Pending)**
Thomas V. Girardi, CA Bar # 36603
Howard B. Miller, CA Bar # 31392
J. Paul Sizemore, CA Bar # 254981
Joseph C. Gjonola, CA Bar # 241955
Jennifer A. Lenze, CA Bar # 246858
GIRARDI | KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Tel:   213-977-0211
Fax:   213-481-1554

**(*Pro Hac Vice Pending*)**
Daniel S. Gruber, CA Bar # 113351
GRUBER & GRUBER
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel:   (818) 981-0066
Fax:   (818) 981-2122

**(*Pro Hac Vice Pending*)**
Howard A. Snyder, CA Bar # 113637
LAW OFFICES OF HOWARD SNYDER
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA, 91403
Tel:   (818) 461-1790
Fax:   (818) 461-1793

**ATTORNEY FOR DEFENDANTS**
Stacey L. Drentlaw
Oppenheimer Wolff & Donnelly LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, MN   55402-1609
(612) 607-7571
Fax:   (612) 607-7100

Dated:   July 21, 2008

Kathleen O'Connor
Filing Attorney for Plaintiff